IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 23, 2020 Session

**LAURA COWAN COFFEY v. DAVID L. COFFEY**

**Appeal from the Chancery Court for Knox County**
**No. 189999-2      Robert E. Lee Davies, Senior Judge**

---

**No. E2020-00157-COA-R3-CV**

---

This is the second appeal in this action, the facts of which date back to the 1995 death of Steven Coffey, the successful owner of a securities business. In 2015, the deceased's widow sued the deceased's father, who had served as executor of the estate. Following summary judgment in favor of the executor, the widow appealed and we remanded the matter to the trial court. Following a bench trial, the trial court ruled, among other things, that the three-year statute of limitations applicable to the widow's claims were tolled by application of the fraudulent concealment doctrine. The executor appealed. Discerning no error, we affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Paul S. Davidson, Taylor J. Askew, and Danielle N. Johns, Nashville, Tennessee, for the appellant, David L. Coffey.

Thomas S. Scott, Jr., Knoxville, Tennessee, David Thomas Black, Maryville, Tennessee, and Christopher T. Cain, Knoxville, Tennessee, for the appellee, Laura Cowan Coffey.

## OPINION

## I.      BACKGROUND

This is the second appeal within this action.  Appellee, Laura Cowan Coffey[1] filed a lawsuit on July 17, 2015, asserting causes of action for fraud, breach of fiduciary duty, conversion, and unjust enrichment.  In the first appeal, we reviewed the trial court's order granting summary judgment to the defendants.  We affirmed the dismissal of the claims for unjust enrichment and extrinsic fraud under Tennessee Rule of Civil Procedure 60.02., but concluded that genuine issues of material fact precluded summary judgment on the remaining claims.  *Coffey v. Coffey*, 578 S.W.3d 10, 24–26 (Tenn. Ct. App. 2018) *perm. app. denied* (Tenn. Feb. 20, 2019) ("*Coffey I*").  The trial court dismissed all defendants except David L. Coffey.  The case proceeded to a bench trial held September 9, 2019 through September 18, 2019.

On July 13, 1995, Steven Coffey ("the deceased") and his mother-in-law, Mrs. Peggy Cowan, were tragically killed in a private airplane crash en route to Hilton Head Island, South Carolina.  The deceased was 38 years old and was survived by his spouse, Laura, and their two children Cliff and Courtney.  As relevant to this appeal, the deceased was also survived by his brother, Michael "Mike" Coffey, and by his father, Appellant David L. Coffey.[2]

The deceased died testate and his will, prepared by attorney Chris Hall, designated the deceased's father, David Coffey, to be executor of the estate and trustee of a testamentary trust ("the family trust").  The deceased's will named Laura and the family trust as beneficiaries of his estate, and also provided that First Tennessee Bank would be the successor executor or trustee, if needed.  David Coffey served as executor from the opening of the estate on July 18, 1995, until the conclusion of its administration on January 23, 1998.  Attorney Chris Hall represented David Coffey with respect to the probate of the estate.  By court order and pursuant to a provision within the deceased's will, the estate was closed without a detailed accounting.

The deceased was an entrepreneur who had formed and had operated as CEO two businesses, Securities Service Network ("SSN") and Renaissance Capital.  SSN was a successful broker-dealer business that employed an innovative processing system to provide fee-based stock brokerage services to financial advisors and representatives.

---

[1] Throughout the record, including in her own briefs, Laura Cowan Coffey is referred to by her first name. We mean no disrespect.

[2] In *Coffey I*, we referred to David L. Coffey as "David the senior."

Renaissance, a wholly-owned subsidiary of SSN, owned physical assets that it leased to SSN. SSN stock was the largest non-liquid asset of the deceased's estate. Soon after the deceased's death, David Coffey instructed Michael Coffey to go to SSN's offices to secure the deceased's computer. Michael Coffey removed the deceased's computer from SSN, copied the computer's contents onto floppy disks, and kept the disks in a box at his own home. Michael Coffey did not share the existence of the floppy disks with anyone until over twenty years later at his deposition.

As Michael Coffey reviewed the computer's contents, he found what is known in this litigation as the Dear Laura letter, the subject line of which is "What to do in the event of my death." Michael Coffey printed the letter, promptly gave a copy of it to his father, David Coffey, and, around the time of her mother's funeral, tendered a copy to Laura. The Dear Laura letter was unsigned, appeared to have been drafted in 1992 and last updated by the deceased in 1994, and instructed as follows: That there was a file at the deceased's office in which Laura would find his latest financial statement and copies of their wills; that Laura should "[c]all Chris Hall or Dennis Ragsdale, the attorneys that drafted the wills," and ask them to file his death certificate with the insurance company, so that she could obtain the insurance proceeds of $1,000,000 for herself and $250,000 for each child, Cliff and Courtney;[3] that Laura should call David Coffey, to "[t]ell him to sell the company as quickly as he can" because "[t]he reps may run, if they don't feel the place is being run competently. He may have to take over on a temporary basis and look like he's heading the place for a while." The Dear Laura letter further instructed that David Coffey

> can call Larry Raffone (he's a friend and he'll help) . . . and tell him you want to sell at 35% of the last 12 months Gross Revenue. Be ready to let it go at 30% of Gross. Look for all cash, but be prepared to accept half down and half in 12 months or maybe even one-third down, a third at [the] end of twelve months and then another third 24 months out. Make them collateralize the outstanding debt with something outside of the business entities. Tell the low ballers to get lost. This place has been built right and is in better shape than anybody else I know of.

Shortly following the airplane crash, David Coffey presented Laura with a resignation letter and she resigned from SSN. As instructed in the Dear Laura letter, David Coffey contacted the deceased's friend, Larry Raffone, who was quite knowledgeable about businesses of SSN's type. Mr. Raffone provided David Coffey potential purchasers for SSN. Although Mr. Raffone agreed with the thirty to thirty-five percent rule of thumb that the deceased had expressed in the Dear Laura letter, he

---

[3] Only two life insurance policies were identified: one for $500,000 and another for $40,000.

indicated to David Coffey that the current sales of broker-dealer businesses were going for ten to fifteen percent of gross revenues.

Before contacting the potential purchasers, David Coffey immersed himself in the management and operation of SSN. In so doing, David Coffey recognized that there was a natural tension between the two remaining executive officers, Mike Neubeck and Brian Propes. David Coffey determined that both men were important to SSN's success, so to fill the vacuum his son's death had caused, he created the "office of the presidency," comprised of three executives who would run the company: Mr. Neubeck, Mr. Propes, and chief financial officer Carl Hollingsworth. This alliance lasted for eight weeks, until Mr. Propes resigned. Then, Mr. Propes's much less experienced assistant became SSN's compliance officer.

Potential purchasers communicated with David Coffey about their interest in buying SSN. David Coffey discussed the sale of SSN with one person in-depth, Pat Pierce, who was an affiliated representative of SSN and who owned Associated Investment Management, Inc. The two men began extensive negotiations in September of 1995. At one point, David Coffey traveled to Omaha to visit Mr. Pierce. David Coffey told Mr. Pierce that he would invest $500,000 of his own cash into purchasing SSN, and that this would be paid to the deceased's estate as part of the purchase price. The proposal also included quarterly dividends to be paid to Laura. An additional term of the proposed sale was the payment of "excess cash" from SSN to the estate. David Coffey told Mr. Pierce that "Laura's cash" would have to be removed from SSN before the sale.[4]

Laura was never informed that the cash in SSN belonged to her as the beneficiary of her late husband's estate and that it was to be removed before Mr. Pierce purchased SSN. David Coffey did not make Laura privy to the discussions he had with Mr. Pierce or the information he obtained from those discussions. However, he did have discussions with Steve Maggart, Laura's CPA.[5] If David Coffey assumed Mr. Maggart was representing Laura in the negotiations, this was just an assumption, because Laura did not indicate to anyone that Mr. Maggart was her agent to negotiate the sale of SSN on her behalf. Eventually, the proposal between David Coffey and Mr. Pierce went awry. On

---

[4] In a note dated "11-16-95," David Coffey wrote "need to remove Laura's cash" and "agrees that Laura should take out excess cash now, before we close."

[5] We credit the trial court's finding that "Mr. Maggart's role in the proposed sale of SSN was unclear . . . . [Laura] initially engaged Maggart to advise her on her personal financial matters, i.e., what amount of income she was going to have and how she was going to pay her bills."

Mr. Pierce's request, David Coffey paid Mr. Pierce $7,000 for his attorney fees either directly out of SSN or by allowing Mr. Pierce a credit toward his monthly fee with SSN.

While David Coffey was negotiating with Mr. Pierce, SSN's net profits were steadily increasing. At that time, Laura was receiving $7,000 monthly rent that SSN was paying to Renaissance Capital, but this was not enough to cover the family's living expenses. David Coffey did not distribute SSN's net profits to Laura as the estate's beneficiary. Rather, SSN retained the net profits. Laura approached David Coffey for an advance from the Estate and was denied. David Coffey also rejected Laura's idea of not selling SSN to keep the business for the deceased's son, Cliff, to eventually run. By December of 1995, David Coffey was no longer trying to sell SSN. David Coffey also misrepresented to Laura that she could not own and operate her late husband's company because she was not properly registered and licensed. Notably, David Coffey himself was neither registered nor licensed.[6] David Coffey represented to Laura that she had to sell the companies to have money on which to live.

David Coffey was a Representative in the Tennessee General Assembly for a decade. In January of 1996, he announced that SSN's chief financial officer, Carl Hollingsworth, would become president of SSN and then left to complete his final term in the General Assembly. From January through May of 1996, no buyers came forward to purchase SSN. In the Spring of 1996, Mr. Maggart suggested that David Coffey and Laura could own SSN together. David Coffey rejected this idea, so Mr. Maggart suggested that David Coffey consider buying SSN. David Coffey told Laura that if he could afford to purchase SSN at an independently appraised price, he would do so.

Acting on attorney Chris Hall's advice, David Coffey employed Mercer Capital Management, Inc. ("Mercer Capital") to conduct an appraisal of SSN's then-present value. Mercer Capital had done valuation work for David Coffey prior to the SSN valuation. David Coffey testified that at a meeting in July of 1996 with Mr. Maggart, there was a proposal that David Coffey purchase SSN for $1.5 Million, which represented "just a general number being picked." The appraisal ("the Mercer Valuation") was completed by accredited senior appraiser Ken Patton. The trial court summarized Ken Patton's testimony as follows:

> Patton testified that there were three general categories of appraisals: 1) an appraisal which is completely controlled by the appraiser; 2) a limited appraisal; and 3) a calculation. In a calculation, the client has much more influence in the methods and procedures of the appraisal, and the appraiser does not consider as many methods. The 1996 Mercer [Valuation] was a

---

[6] At trial, a securities compliance expert testified that both Laura and David Coffey could own SSN as long as they were not involved in its day-to-day management.

calculation. Patton conducted telephone interviews, he met with Hollingsworth and David Coffey, and reviewed financial documents furnished by SSN. Patton ruled out one of the three major approaches, the transaction method, since there were no other sales of a company similar to SSN. He did use the net asset approach and the income approach.

Patton acknowledged there was no mention of the thirty to thirty-five percent rule of thumb [as] suggested by [the deceased] in the Mercer Valuation. He explained that neither David [Coffey] nor his attorney, Chris Hall[,] furnished him with a copy of the Dear Laura letter or ever informed him of [the deceased's] rule of thumb. Patton acknowledged that if he had this information, he certainly would have considered it; however, he was not sure if it would have impacted his final valuation of the company. Patton indicated that the asset approach resulted in a value of $700,000, but he did not give much weight to that approach and instead relied on the income approach.

Patton knew that the intended use for his appraisal was for the sale of the company. This is important since the purpose of the appraisal directs the appraiser to an appropriate set of rules and regulations for considering value. Patton was told by [SSN] management [their] expectations for growth [to] slow.[7] Patton also considered that SSN did not have an experienced compliance officer and that SSN's unique model of one hundred percent commission payout resulted with significant cash flowing through the company as both income and expense without any associated profitability. In addition, SSN had recently acquired a customer who accounted for twenty percent of its total revenues, which could have [had] a significant negative impact if the customer [had] left. In his report [(the Mercer Valuation)] dated August 16, 1996, Patton, on behalf of Mercer Capital, concluded the fair market value of SSN was $1,557,200 as of July 31, 1996 using the adjusted capitalization of earnings method. Although the initial draft of the Mercer Valuation also included a ten percent discount, Chris Hall informed Mercer that David [Coffey] did not want to take a discount. This had the effect of increasing the value of the company. On cross examination, Patton acknowledged that his income approach did not consider whether after tax income stayed in the company or was to be paid out prior to the sale. At the time of the valuation, there was $1.2 million in cash which Patton stated was working capital; however, he

---

[7] There was tremendous growth at SSN, beginning in 1995. Mr. Patton testified that revenues exploded upward in 1996. SSN management's anticipation of a downturn was wrong.

admitted this conclusion was based entirely on his conversation with Hollingsworth and David [Coffey].

At trial, Mr. Patton admitted that had he used the twelve-month trailing revenue number of $18,000,000 instead of the year-end 1996 revenue number of $12,000,000 in the appraisal, the resulting valuation would have been higher.

In May of 1996, David Coffey, Laura, Mr. Maggart, and attorney Chris Hall met to discuss David Coffey's possible purchase of one hundred percent of the shares of SSN from the estate. At that point, attorney Hall recommended that David Coffey request a court-appointed guardian ad litem to represent the interests of the minor children, Cliff and Courtney, and an administrator ad litem to represent the interests of the estate as related to the sale of the deceased's companies to David Coffey. This was in contrast to the deceased's wishes, as expressed in his will. The will gave Laura guardian status over her children. Furthermore, the will directed that First Tennessee Bank was to be the executor should David Coffey fail to qualify or cease to serve. The trial court found that "the parties had a second meeting in June 1996 where they agreed the purchase price [of the deceased's companies] would be set by Mercer Capital and would include the purchase of Renaissance for book value."

Attorney Hall prepared David Coffey's petition for the appointment of administrator ad litem and guardian ad litem, recommending to the court that it appoint Paul Harrison and Ed Cox, to serve in these respective roles. The court appointed attorneys Harrison and Cox by order entered July 29, 1996. Attorney Hall had practiced law with attorney Cox in the past, and attorney Harrison had recently left attorney Hall's firm. Attorney Hall informed the attorneys ad litem that all parties wanted SSN to be sold if the attorneys ad litem approved the ultimate sales price. Thus, the deal was already made such that attorneys Harrison and Cox played a minor role in these events and did not negotiate on behalf of the estate or the minor children the price at which the deceased's companies would be sold to David Coffey. At no point did David Coffey or attorney Hall provide the Dear Laura letter to the attorneys ad litem or to the court. David Coffey brought Laura papers to sign so that he could obtain the court's approval to purchase the companies himself. He told Laura that she did not need to go to court because he and attorney Hall were handling everything. Attorney Hall prepared David Coffey's petition for approval of the sale.

Although the Mercer Valuation valued SSN as of July 31, 1996, the sale of the companies did not close until September 3, 1996, when the court entered its order approving the sale of stock. Shortly thereafter, David Coffey transferred $1,613,200, representing his purchase price of SSN and Renaissance, into the estate brokerage

account.[8]  On January 23, 1998, the administration of the estate concluded. The court entered an order to close the estate without a detailed accounting, pursuant to the terms of the deceased's will.  At David Coffey's request, the estate documents were sealed by court order.

It is undisputed that SSN did not decrease in value between the deceased's death and David Coffey's purchase of SSN.  Noting David Coffey's admission that all the profits of SSN remained in the company during this time period, the trial court found that from February 1 to June 30, 1996, SSN earned $305,770, and that from July 1 to August 31, 1996, the company earned $120,000 of profit.  The trial court found that as of February 1997, the retained earnings amounted to $1,004,527.  The trial court observed that "[a]t the time he purchased SSN, there was no one who knew more about SSN than David Coffey," despite his testimony to the contrary:

> Although David [Coffey] testified that he felt the company was risky, that he did not understand the company, and that he called his two surviving children to apologize about investing as much money in SSN, the Court finds that testimony not credible.  David [Coffey] was a very sophisticated businessman and investor.  He had a history of buying and selling closely held businesses.  He also had the advantage of observing the operations of SSN for an entire year before he purchased it.  During this year, not a single sales rep left the company.  The only person who left was the compliance officer, Propes.  David [Coffey] had access to all of the financial information concerning the company and had his 'finger on the pulse' of SSN.

From the time of her husband's death through the closing of his estate, Laura trusted her father-in-law's representations to her regarding the estate.  She had known David Coffey since the late 1970s and was grateful to him for stepping up and taking control of SSN.  Her late husband had always managed the family's finances, and she had no idea how to proceed.  At the time, she had no misgivings about the sale of SSN and Renaissance to David Coffey or about his treatment of her while he was executor of the estate.

From 1996 until 2001, Laura unsuccessfully sued a company involved in the crash that killed her husband and mother.[9]  To establish damages during that wrongful death

---

[8] David Coffey paid $1,557,200 for SSN plus $56,000 for Renaissance.

[9] *Coffey v. Cherokee Aviation, Inc.*, No. E1999-01037-C0A-R3-CV, 2000 WL 991657 (Tenn. Ct. App. July 19, 2000) *perm. app. denied* (Tenn. Mar. 5, 2001).

litigation, Laura's attorney relied upon the Mercer Valuation and SSN's financial statements, reports, and stock purchase and sale agreements related to David Coffey's acquisition of SSN. As of 2002, the Mercer Valuation was within one of multiple boxes given to her at the end of the litigation. The boxes contained materials from the crash litigation, including a picture of the charred remains of her husband. Due to the explicit nature of the images, Laura promptly put the boxes in her attic without further review. Laura maintains that she never retrieved nor reviewed the Mercer Valuation contained therein until September 2014.

According to Laura's son, Cliff, by 2006 she had not "indicated any concern about the way the estate had been handled or SSN had been sold." That same year, Laura met with David Coffey. In the meeting, he told her that he had decided to transfer 100% of the SSN stock to a Grantor Retained Annuity Trust ("GRAT") for estate planning purposes, and that his two surviving children and the deceased's and Laura's two children would be the beneficiaries. David Coffey also informed Laura that she was not a beneficiary of the GRAT and that SSN's value had appreciated to $18,000,000.

During the 2008 and 2009 recession, Laura lost quite a bit of money that was invested in the stock market, so she was feeling insecure about her family's financial future. Her daughter Courtney married in 2009 and had a young child, but her husband lost his job. Laura was commuting to Nashville to help watch her granddaughter so Courtney could work. At the time, Laura was seeing a psychiatrist who suggested that she confront the issues and feelings that she had regarding her former in-laws. She contacted the deceased's brother, Michael Coffey, told him that she had never seen the Mercer Valuation that had been spoken of for many years, and requested a copy. On January 12, 2009, Michael Coffey emailed Laura the 1996 Mercer Valuation noting, "Hopefully this email will go through. The appraisal is 64 pages long, so the file is pretty big. Let me know if you get it and all appears okay." Laura testified that she was not aware of that email, but does not dispute that she received it. Michael Coffey testified that he also mailed Laura a hard copy of the Mercer Valuation. Laura admitted that she received a two-page summary of the Mercer Valuation in the mail, but she never did anything with this information.

The trial court found that in 2010, "after she had met with her psychiatrist, [Laura] decided to ask questions that she had never broached with the Coffeys." The trial court detailed these exchanges as follows:

> She reached out to Michael regarding the [Mercer] valuation of SSN, seemingly unaware that he had already sent that to her in an email. However, as a result of her conversation with Michael, David [Coffey] sent Laura a copy of the Mercer valuation by email on March 19, 2010. When

Laura received the email from David [Coffey] with the Mercer valuation, she forwarded it to her son, Cliff. Cliff was attending Cornell University where he was working on an MBA. At that time, Cliff was on spring break and never opened the email until years later. Laura also forwarded the email to Michael Coffey and Karen Coffey Williams and requested Michael to meet with her, to which Michael agreed.

On March 31, 2010, Laura called Michael and asked if there was something wrong with the acquisition of SSN by David [Coffey]. She said that she had concerns that David [Coffey] was acting as both buyer and seller in the acquisition of SSN. Laura asked Michael if David [Coffey] had done anything that was illegal in the sale of SSN, to which Michael responded, "absolutely not."

The remainder of Michael Coffey and Laura's telephone conversation involved Laura's airing of hurt feelings about things that David Coffey had allegedly done or said to her, and Michael's defense of David Coffey. After the telephone call, there was a less-than-positive email exchange between Laura and Michael. They decided not to meet in person and after April 2010, they did not discuss the sale of SSN.

Around the same time, Laura also spoke with David Coffey. She recalled that "[o]nce [David] Coffey found out that I had requested a Mercer valuation, he became angry, I'm assuming, thinking that I thought something was wrong." David Coffey suggested that they meet with attorney Hall and Mr. Maggart to discuss the Mercer Valuation, but Laura declined.

Next, Laura spoke with a friend, attorney Tom Wall. Mr. Wall recommended that she contact a lawyer. This was the same advice Laura's then-third-husband, Jeffrey Bowlin, had offered her. The trial court summarized the subsequent events as follows:

Bowlin indicated that Laura talked a lot about the estate and that she was concerned that David [Coffey] had bought SSN for less than it was worth. However, she never explained to Bowlin the reason for her concern. Bowlin indicated that he would see Laura cry on occasion when discussing the estate. At his suggestion, Laura contacted an attorney in Minnesota that Bowlin knew, and that attorney suggested that she call Baker Donelson.

Laura followed this advice and set up a meeting with Matt Sweeney of Baker Donelson in Nashville. Bowlin went with her to see Matt Sweeney. Laura met with Attorney Sweeney for twenty minutes, and she showed him the two-page summary of the valuation that she received from Michael.

She told Sweeney that she received $1.6 million dollars for SSN and Renaissance. Sweeney told Laura that if she wanted to understand what had happened, she would have to ask for many more documents. Bowlin attended the meeting with Laura; however, he could not remember if she brought anything with her. He did confirm that after the meeting Laura was upset because Sweeney told her there was no lawsuit.

Attorney Sweeney followed up their meeting with a letter dated May 11, 2010 in which he confirmed that he did not agree to represent Laura and therefore did not provide her with any legal advice regarding her situation. Sweeney did advise Laura about the statute of limitations and that she should decide promptly whether to retain counsel and then whether there was any basis to assert a claim against anyone.

Acting on Attorney Sweeney's advice, Laura contacted Chris Hall, the attorney for David [Coffey] in his role of executor of the estate. Laura asked Hall for extensive documentation; however, Hall only sent her a few documents, mostly which were not relevant to her inquiries. Hall also indicated that they would have to request the probate judge to unseal the file if they needed anything else, and that the file had already been sent to storage making his ability to obtain copies of the probate records more difficult. Laura was not satisfied with Hall's response and again contacted him requesting more information regarding the probate of her husband's estate. On June 3, 2010, Hall wrote Laura informing her that she had waived the need for a personal representative to prepare a final accounting and that she had released David [Coffey] from all liabilities and obligations with respect to the probate of the estate. Again, Laura contacted Hall's office and requested him to provide an accounting of all legal fees paid by the estate. On August 2, 2010, Hall responded by letter which provided in part as follows:

> Mr. [David] Coffey and I would have been happy to provide you with a detailed accounting of legal fees paid by the estate if you had asked for one, but you waived your right to receive a final accounting. We are not willing, at this late juncture, to prepare an accounting that you voluntarily waived thirteen years ago . . . . Mr. [David] Coffey administered the estate in a fair and reasonable manner in accordance with Tennessee laws governing fiduciaries and he expended countless hours of work on behalf of the estate at no charge . . . . We (Hall and David [Coffey]) both worked hard to follow the terms of Steve's last

will and testament and to keep your advisor, Steve Maggart, apprised of information and developments that we thought you would want to know. At this point, however, the probate of the estate has long since passed.

After receiving the response from Chris Hall that David [Coffey] had been completely above board and treated her fairly [when he was] executor of the estate and that he was not willing to provide her with any of the documents that she requested, Laura terminated her investigation of the sale of SSN to David [Coffey] and the performance of his duties as executor.

The matter laid dormant until September of 2014, when Cliff received an email from his uncle Michael Coffey notifying him that SSN was going to be sold for $45,000,000. Cliff also read a press release announcing the sale which indicated that SSN's revenues at the time were approximately $110,000,000. At the time, Cliff and his sister Courtney were beneficiaries to the trust that owned SSN. The sale did not sit well with Cliff because he had wanted to be involved with SSN and to be placed on its board, but had always been rebuffed by his grandfather, David Coffey. Instead, David Coffey placed his son Michael on the board. Cliff was hurt by being excluded from the company because his late father had built it, because he viewed the company as his late father's legacy, and because he thought SSN had more of a connection to his own family than to his uncle Michael's family.

Cliff called Laura, informed her of the upcoming sale of SSN, and asked her for any financial information she had related to the 1996 sale of SSN by the estate to David Coffey. Laura sent Cliff the two-page valuation, but could not find the full Mercer Valuation. One month later, Laura found the entire Mercer Valuation in her attic, stored in a box from the wrongful death lawsuit that ended in 2001. She forwarded the appraisal to Cliff who by that point, thanks to his dual master's degrees in real estate finance and investments and an MBA in investment banking and corporate finance from Cornell University, could understand the appraisal. In October of 2014, Cliff and Laura reviewed the Mercer Valuation together. Cliff developed concerns. He noticed the revenue performance of SSN and how it trended up. He was concerned that SSN sold for roughly $1.5 million in July of 1996, significantly less than what his late father had instructed in the Dear Laura letter, while at the same time its revenue increased from $6 million to $20 million. Cliff had to explain the Mercer Valuation to Laura several times before she began to understand it. Cliff expressed his concerns to his uncle Michael, who responded that attorney Chris Hall ordered the appraisal and that everything concerning the sale of SSN had been done correctly. Cliff replied, "it looks like the buyer of the company did the valuation, right?" On December 13, 2014, Cliff emailed David Coffey and Michael Coffey outlining his specific concerns about the purchase of SSN by David Coffey. He

never received a response to the email from either David or Michael Coffey. At that point, Laura engaged counsel who began the investigation leading to this lawsuit.

Following trial, on January 13, 2020, the trial court entered its memorandum and order finding that (i) David Coffey had fraudulently concealed Laura's causes of action, thus tolling the running of the statute of limitations until 2014; (ii) Laura failed to carry her burden that David Coffey had improperly influenced the appraisal of SSN prior to purchasing it; and (iii) David Coffey breached his fiduciary duty and converted $522,000 of excess cash by failing to cause SSN to distribute that amount to the estate before purchasing SSN. The trial court awarded Laura a judgment in the amount of $522,000, plus prejudgment interest of ten percent per annum from September 3, 1996, through January 13, 2020. David Coffey timely appealed.

## II.    ISSUES

David Coffey raises three issues for our review: (a) whether the trial court erred in finding that Laura met her burden to prove the three-year statute of limitations had been tolled by the discovery rule or by fraudulent concealment; (b) whether the trial court erred in finding that he breached his fiduciary duty and committed conversion by retaining $522,000 of SSN's excess cash; and (c) whether the trial court erred in awarding Laura the maximum amount of prejudgment interest on its award of $522,000.

In her posture as Appellee, Laura raises the following issues: (d) whether the trial court erred by placing the burden on her to prove that David Coffey improperly influenced the Mercer Valuation, instead of shifting the burden to David Coffey, as fiduciary, to prove the fairness of the transaction by clear and convincing evidence, resulting in an under-calculation of her damages; or, alternatively, (e) whether the trial court erred by determining that she failed to prove that David Coffey improperly influenced the 1996 transaction.

## III.    STANDARD OF REVIEW

We review a non-jury case de novo upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). The presumption of correctness applies only to findings of fact and not to conclusions of law. *Campbell v. Florida Steel Corp.*, 919

S.W.2d 26, 35 (Tenn. 1996). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011). This is because the trial court alone had the opportunity to observe the appearance and demeanor of the witnesses. *Royal Ins. Co. v. Alliance Ins. Co.*, 690 S.W.2d 541, 543 (Tenn. Ct. App. 1985).

"An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

## IV. DISCUSSION

### (a) Tolling of the Statute of Limitations

"A defense predicated on the statute of limitations triggers the consideration of three components—the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines. All of these elements are inter-related and, therefore, should not be considered in isolation." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 456 (Tenn. 2012). The date on which a claim accrues is the date on which the limitations period begins to run. *Id*. at 457. Although the burden of proof is upon the party asserting the bar of the statute of limitations to show the bar, when that showing is made, the burden shifts to the other party to show the applicability of any doctrine which would toll the running of the statute of limitations. *See Coffey I*, 578 S.W.3d at 22.

The statute of limitations may be tolled by application of the discovery rule and by application of the fraudulent concealment doctrine. Under the discovery rule, "a cause of action accrues and the statute of limitations begins to run not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of wrongful conduct." *Redwing*, 363 S.W.3d at 459 (citations omitted). The discovery rule includes "not only the discovery of the injury but also the discovery of the source of the injury." *Id*. at 458 (citing *Sherrill v. Souder*, 325 S.W.3d 584, 595 (Tenn. 2010)); *see also John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (holding that the cause of action accrues when the plaintiff knows or in the

exercise of reasonable diligence should know that it sustained an injury "as a result of wrongful or tortious conduct by the defendant").

"[T]he doctrine of fraudulent concealment is aligned with the discovery rule." *Redwing*, 363 S.W.3d at 462. As set forth by the Tennessee Supreme Court, the elements of fraudulent concealment are:

> (1) an affirmative act by the defendant to conceal the cause of action or the failure to disclose material facts despite a duty to speak; (2) that the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence; (3) the defendant must be aware of the wrong; (4) the concealment of material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry.

*Coffey I*, 578 S.W.3d at 22 (citing *Redwing*, 363 S.W.3d at 462–463). In general, the affirmative act to conceal material information must be more than mere silence. *Shadrick v. Coker*, 963 S.W.2d 726, 735 (Tenn. 1998). However, "when there is a confidential or fiduciary relationship between the parties, the 'failure to speak where there is a duty to speak is the equivalent of some positive act or artifice planned to prevent inquiry or escape investigation.'" *Id*. (quoting *Hall v. DeSaussure*, 297 S.W.2d 81, 85 (Tenn. Ct. App. 1956); *Benton v. Snyder*, 825 S.W.2d 409, 414 (Tenn. 1992)). "Plaintiffs asserting the doctrine of fraudulent concealment to toll the running of a statute of limitations must demonstrate that they exercised reasonable care and diligence in pursuing their claim." *Redwing*, 363 S.W.3d at 463. Application of the fraudulent concealment doctrine serves to toll the statute of limitations "until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim." *Id*. At that point, "the original statute of limitations begins to run anew, and the plaintiff must file his or her claim within the statutory limitations period." *Id*. Whether the plaintiff exercised reasonable diligence to discover her claims against the defendant is a question of fact. *Id*. at 466 (citing *Sherrill v. Souder*, 325 S.W.3d at 596); *see Wyatt v. A-Best, Co.*, 910 S.W.2d 851, 854 (Tenn. 1995).

It is undisputed that the sale through which David Coffey purchased SSN and Renaissance closed on September 3, 1996. The parties previously stipulated that Laura's claims sound in tort, so the statute of limitations is three years. *See* Tenn. Code Ann. § 28-3-105. Laura filed suit on July 17, 2015, sixteen years after the statute of limitations would have expired.

We turn now to the evidence that was presented to the trial court on this issue. Importantly, the trial court made specific findings as to the relative sophistication of the parties which, although not an element of fraudulent concealment, cannot be ignored given the facts of this case and David Coffey's role as executor:

> Laura Coffey was an unsophisticated and naïve person on matters related to business transactions, estate matters, and basic finances. Since her marriage to [the deceased], she had performed the duties of housewife and mother. Although she was secretary of SSN, this was in name only. Laura simply signed whatever documentation her husband asked her to sign. Her husband handled all of the personal finances of the family. Upon the death of her husband and her mother, Laura was consumed by grief. She trusted her father-in-law and completely relied upon him to handle her husband's estate. . . . While [in 2006] Laura was understandably upset with her father-in-law for cutting her out of the [GRAT], it does not follow that she should have been suspicious with regard to the sale of SSN.

David Coffey, by contrast, "was a very sophisticated business man and investor . . . [who] had a history of buying and selling closely held businesses." He had "his 'finger on the pulse' of SSN" and "there was no one who knew more about SSN than David Coffey."

On appeal, David Coffey first argues that the trial court did not identify any affirmative act by him or by his agents to conceal Laura's potential causes of action. We disagree. Keeping in mind the fiduciary relationship, the trial court first and foremost found that neither David Coffey nor attorney Hall provided the Dear Laura letter to Ken Patton, the person tasked with appraising the estate's largest asset, SSN. Both men kept silent about the fact that the Dear Laura letter contained the deceased's wishes concerning the sale of his company and his rule of thumb for the sale price.[10] The trial court further found that neither David Coffey nor his attorney shared the existence of the Dear Laura letter or the rule of thumb contained therein with the attorneys ad litem who were supposed to be representing the interests of the estate while David Coffey purchased its largest asset. Additionally, the trial court recounted Pat Pierce's proposal to purchase SSN, which would have included quarterly dividends paid to Laura and the payment of SSN's excess cash to the estate, and the fact that David Coffey did not discuss this proposal with Laura. The trial court found that David Coffey inaccurately told Laura she could not own SSN. The trial court also noted Michael Coffey's assurance to Laura in 2010 "that everything David had done regarding the sale of SSN was above board and

---

[10] Mr. Patton acknowledged that he certainly would have considered the Dear Laura letter in performing the Mercer Valuation. David Coffey's own expert, David Michael Costello, opined that Ken Patton "should have considered" the Dear Laura letter.

legal." Finally, as to Laura's quest for documentation on the sale of SSN and David Coffey's actions as executor, the trial court found:

> [Laura] contacted Attorney Hall who David [Coffey] consulted when dealing with Laura on just about everything. Hall gave Laura the 'runaround' and never sent her the documents she was requesting. When Laura persisted, Hall wrote her a stern letter, rebuffed her request, and told her that David [Coffey] had administered the estate fairly in accordance with the laws governing fiduciaries.

Second, David Coffey argues that Laura's access to some or all of the Mercer Valuation at various times from 1996 to 2010, and her attorney's reliance on the valuation to establish damages in the wrongful death litigation, conclusively prove that she did not exercise reasonable care and diligence in discovering her claims. He maintains that it was Laura's "obligation to read the documents available to her and ask questions about them." The trial court did not take such a narrow view of the facts surrounding Laura's reasonable care and diligence. The trial court found that Laura was unaware she had received the full Mercer Valuation in emails from David and Michael Coffey, and "[e]ven if she had received the valuation, she was incapable of interpreting the report, which explains why she forwarded the email to her son Cliff." Cliff testified that he was "no expert by any means" but, by 2014, having "graduated from business school" and having "worked valuing companies for a couple years," he could understand the Mercer Valuation enough to explain its import to Laura. Even still, Cliff "had to follow up with her . . . and show her what the numbers meant, and that's how we got to that."

David Coffey also maintains that Laura "could easily see that the price [he] agreed to pay was less than the 'rule of thumb' in the Dear Laura letter," that Laura "could also easily see that the terms of the Transaction did not include her receipt of a cash distribution from SSN," and that Mr. Maggart[11] and Laura had every opportunity to discuss the terms of the deal with the appraiser. Although the details of David Coffey's purchase of SSN for himself may have been easy for him and for his counsel to understand, the evidence shows that this was not the case for others. For instance, Michael Coffey, who eventually served on SSN's board, testified that he was "a little bit" familiar with the full sixty-four-page Mercer Valuation and further testified:

> Q. All right. You didn't see anything in that 64 pages that a layperson would look at and read something like Mr. Coffey did this or Mr. Coffey

---

[11] Again, the trial court found that Mr. Maggart's role in the transaction was unclear, and the evidence does not support a finding that he was negotiating the terms of the transaction on Laura's behalf.

did that and this was wrong, anything like that? You didn't see anything like that in the appraisal, did you?

A. No, there wouldn't be something like that in an appraisal, I don't think.

Q. . . . [T]here was financial information --

A. Yes.

Q. -- in the appraisal, right?

A. Right.

Q. Would you expect somebody without financial training to know what a capitalization rate would be, and how it might affect an appraisal?

A. I think you would need to -- need to be a valuation person really to understand the valuation principles in these things.

. . .

Q. Okay. My point is, there's nothing overtly in the Mercer appraisal that put Laura on notice of any wrongdoing on the part of your father, do you agree with that or not?

A. I agree with that.

Additionally, Laura's expert witness, Mr. Curtis Kimball, opined that the average person or an ordinary lay person reviewing the Mercer Valuation would find it "very, very difficult" to determine she had been "cheated." In short, the evidence in the record preponderates in favor of the trial court's findings on these points.

The trial court also detailed another reason Laura did not discover potential causes of action against David Coffey prior to 2014. The trial court found that, on the advice of her then-husband, Laura made an appointment in 2010 with attorney Matt Sweeney to discuss questions and concerns, but "it is clear from Sweeney's [disengagement] letter that he was unable to give her any advice regarding her concerns." Laura's then-husband "remembered Laura was upset because Sweeney had told her there was nothing he could do since he did not have enough information," noted the trial court.

Third, David Coffey asserts that the trial court "erred in finding that [he] knew he should have required SSN to make a distribution of 'excess cash' to Laura Coffey from SSN's equity prior to the sale in 1996." He argues that SSN's management made the decision. However, the evidence illustrates that David Coffey was running the show at SSN at the time, especially the sale. Notably, when Pat Pierce was SSN's potential buyer, David Coffey wrote "need to remove Laura's cash" and "agrees that Laura should take out excess cash now, before we close." David Coffey was aware that, as executor of the deceased's estate, he was fiduciary to the estate's beneficiaries. He does not argue otherwise.

Finally, David Coffey argues that he did not mislead anyone, attempt to evade suspicion, or prevent inquiry. At the time of the sale of the SSN stock, David Coffey was in a trusted fiduciary relationship with Laura, so he had a duty to disclose material information to her concerning the deceased's estate, of which she was beneficiary. Instead, as outlined previously in this opinion and as the trial court found throughout its order, David Coffey remained silent about, concealed, or misrepresented several material facts surrounding his purchase of the companies. The trial court scrutinized the sale:

> The court: So when the estate was selling it to Mr. David Coffey, you know, they had to go to court, get it approved, you had an administrator ad litem, you had a guardian ad litem, nobody showed you the report or went over the report with you?

> Laura: No, never spoke to me about the report, other than the bottom line value. This is what they say the company is worth, this is what I'm going to pay. That's basically it.

Based upon the breadth of evidence presented at trial and the specific evidence detailed above, the trial court concluded that "the conduct by David [Coffey] and his agents constituted fraudulent concealment to toll the running of the statute of limitations," and that Laura proved "that even though she exercised reasonable diligence, she could not have discovered the cause of action due to the conduct of Defendant, David Coffey." We agree that Laura exercised reasonable diligence under the circumstances. The evidence in the record preponderates in favor of the trial court's findings. Accordingly, we affirm the trial court's determination that the statute of limitations applicable to Laura's claims was tolled until 2014 by application of the fraudulent concealment doctrine.

## (b) Breach of Fiduciary Duty and Conversion

David Coffey contends that the trial court erred in finding that he breached his fiduciary duty and converted SSN's excess cash belonging to Laura. It is well established that "[a]n executor of an estate occupies a fiduciary position" and owes certain duties to the estate and the beneficiaries. *In re Estate of Ladd*, 247 S.W.3d 628, 637 (Tenn. Ct. App. 2007) *perm. app. denied* (Tenn. Nov. 19, 2007). Accordingly, the executor must deal with the beneficiaries in utmost good faith and "exercise the same degree of diligence and caution that reasonably prudent business persons would employ in the management of their own affairs." *Id*. (citations omitted).

Conversion is an intentional tort, and a party seeking to make out a prima facie case of conversion must prove (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, and (3) in defiance of the true owner's rights. *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977).

> Although there is authority to the contrary, the general rule is that money is an intangible and therefore not subject to a claim for conversion. However, there is an exception where the money is specific and capable of identification or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose. Identifiable funds are deemed a chattel for purposes of conversion, and conversion may be established where a party shows ownership or the right to possess specific, identifiable money.

*PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp*., 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) *perm. app. denied* (Tenn. Sept. 19, 2012).

In this case, the trial court found that once David Coffey decided to purchase SSN from the estate, he should have resigned as executor due to the inherent conflict of interest. Then, First Tennessee Bank would have been appointed successor executor to negotiate on the estate's behalf, pursuant to the will's terms. The trial court concluded that, by failing to resign as executor, David Coffey breached his duty of undivided loyalty to Laura and to the estate because:

> Here, there was no one representing the estate to negotiate the terms of purchase and specifically the issue of excess cash. [Attorneys ad litem] Harrison and Cox did not negotiate on behalf of the estate. Their only function was to approve or disapprove the purchase price. Thus, the

oversight by the Court was perfunctory since neither Cox nor Harrison [was] made aware of the excess cash issue.

. . .

[Ken] Patton admitted that as of June 30, 1996, there was $714,000 of equity in SSN. Kimb[all] testified there should have been an accounting of all the cash at the time of the sale and that the excess cash should have been reserved to the seller (the estate). Normally, that would be an issue which would be subject to negotiation between the buyer and the seller. Here, however, as executor, David [Coffey] was both the buyer and the seller.

If David [Coffey] as executor had been acting solely for the benefit of the estate, he should have insisted that $522,000 in excess cash be paid out to the estate prior to the closing on September 3, 1996. Instead he placed his own interest as the buyer over that of the estate and retained all of the excess cash. This was a breach of his fiduciary duty as executor of the estate which caused an injury to the estate in the amount of $522,000.

The trial court also concluded that David Coffey "committed the tort of conversion by converting $522,000 in excess cash which should have gone to the estate and ultimately Laura Coffey upon the sale of SSN."

In challenging the trial court's findings, David Coffey argues that excess cash is a nebulous concept in this litigation. We find this argument unavailing because the record illustrates: David Coffey recognized the idea of removing cash from SSN when he was negotiating its sale with Pat Pierce; a securities compliance expert witness discussed excess net capital and testified that excess cash could be defined as capital in excess of what was required by the SEC, which was then $100,000; Laura's expert on the matter of estate administration, Albert W. Secor, testified that Laura owned SSN before it was sold and its profits belonged to her; Laura's expert witness, Mr. Kimball, conducted an analysis and estimate of excess cash in SSN as of June 30, 1996, the last day of the data period covered by the Mercer Valuation; and, more importantly, the trial court defined the term. The trial court found:

The NASD and SEC required SSN to maintain a minimum of $100,000 as "net capital." The net capital requirement was to ensure the company maintained enough funds to pay off liabilities to customers. In addition to the minimum net capital requirement, SSN would need to have operating capital. However, after reserving some amount for operating capital, excess cash is the amount of retained earnings or profits left in the company.

- 21 -

The evidence does not preponderate against this definition or against the trial court's decision to credit Laura's expert witness when calculating the amount of excess cash.

For this reason, we also reject David Coffey's argument that the amount of excess cash in SSN, "if any," at the time of the sale was "an indeterminate sum that is not subject to a claim for conversion." He is correct that the Mercer Valuation simply concluded there was no excess cash in SSN at the time due to "management's" expectation—which turned out to be incorrect—that the company's growth would slow dramatically and that dividends would not be paid in the foreseeable future. However, upon finding that "Patton never made any analysis of excess cash in [the Mercer] valuation," the trial court credited Mr. Kimball's expert testimony and calculated the company's cash at the end of the valuation period to be "$400,000 in excess cash as of June 30, 1996." The trial court found that from the date of the Mercer Valuation, "July 31 to the closing on September 3, 1996 there were additional profits of $122,000, for a total of $522,000 in excess cash." Mr. Kimball explained that because the Mercer Valuation was "based on the financial statements closing on 6/30/1996, it's been my experience in working with mergers and acquisitions and buyers and sellers in that area that the seller will retain the cash or the profits for the period of time between the notion of the valuation date and the closing date. It's a common practice." Mr. Kimball agreed that if that is not done, it has the effect of the buyer purchasing the company with part of the seller's money. As the trial court noted, "[f]urther buttressing Kimb[all's] analysis of excess cash is the fact that a few months later in December 1996, David [Coffey] paid himself a $400,000 dividend.[12] The evidence does not preponderate against the trial court's calculation of excess cash.

David Coffey also contends that his conflict of interest was "known by all" and "addressed according to the statutory processes set forth in the Tennessee Code." *See* Tenn. Code Ann. §§ 30-1-109 and 30-2-303. As the trial court correctly observed, "[i]n this case, the executor conducted a private sale. By making a private sale, an executor invites questions regarding the integrity of his conduct." Although the trial court acknowledged that attorneys Harrison and Cox were appointed as attorneys ad litem and that the chancery court ultimately approved the sale, it was proven that David Coffey did not share material information, such as the Dear Laura letter, with either attorney or with the court. Mr. Secor concluded there was no evidence that attorney Harrison participated in the negotiation of the sale or price or the stock purchase agreement. He simply looked at the price and determined, based on the Mercer Valuation, that it was okay. It was also proven that the transaction was not arm's length.

---

[12] As referenced in a trial exhibit, when SSN was again sold in 2015, David Coffey did take "cash of $8,200,000" prior to or at the closing of the sale.

With the above considerations in mind, we affirm the trial court's finding that David Coffey breached his fiduciary duty and converted $522,000 of excess cash belonging to the estate.

*(c) Prejudgment Interest*

Pursuant to Tennessee Code Annotated section 47-14-123, prejudgment interest may be awarded "in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." "An award of prejudgment interest is within the sound discretion of the trial court[.]" *Myint*, 970 S.W.2d at 927 (citations omitted). The "principles of equity" are foremost in guiding an award of prejudgment interest and "the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case." *Id*. "[T]he purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Id*. (citations omitted). An award of prejudgment interest addresses damages incurred by a party "because they have been deprived of the use of that money from the time they should have received it until the date of judgment." *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000). "[I]f the existence or amount of an obligation is certain, this fact will help support an award of prejudgment interest as a matter of equity." *Myint*, 970 S.W.2d at 928. However, "[t]he uncertainty of either the existence or amount of an obligation does not mandate a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable. The certainty of the plaintiff's claim is but one of many nondispositive facts to consider when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances." *Id*.

The trial court awarded Laura prejudgment interest at the rate of ten percent per annum because "David [Coffey] breached his fiduciary duty and retained th[e] excess cash [of $522,000] for his own benefit." David Coffey argues that the award was in error because "both the existence and the amount of an obligation to distribute 'excess cash' was in reasonable dispute."

Here, as in most cases, the defendant reasonably disputed the plaintiff's right of recovery. "The test for determining whether the amount of damages is certain is not whether the parties agree on a fixed amount." *Id*. Rather, "the test is "whether the amount of damages is ascertainable by computation or by any recognized standard of valuation . . . even if there is a dispute over monetary value or if the parties' experts compute differing estimates of damage." *Id*. The trial court calculated Laura's damages based on the testimony of the expert witnesses, particularly Mr. Kimball. For twenty-

four years, Laura has been denied the use of the monetary damages. The trial court's decision to award prejudgment interest at the maximum rate was equitable under the facts of this case, was based on applicable legal principles, and was consistent with the evidence. *See Overstreet v. Shoney's, Inc*., 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). Therefore, we affirm the trial court's discretionary decision to award Laura prejudgment interest at the rate of ten percent per annum from September 3, 1996, through January 13, 2020.

### *(d) & (e) Undue Influence*

In her posture as Appellee, Laura argues that the trial court erred by not applying a presumption of undue influence on the entire transaction by which David Coffey purchased SSN from the estate. Specifically, she maintains that David Coffey "grossly undervalued SSN, paying [her] and the Estate anywhere from $3,722,800 to $4,943,000 less than it was worth." Laura calculates these figures by using her expert Mr. Kimball's fair market value and by using the deceased's 35% of the trailing twelve-month revenue rule of thumb. David Coffey responds that Laura did not meet her burden to trigger the presumption of undue influence and thereby shift the burden of proof to him to rebut it by clear and convincing evidence. *See ORNL Fed. Credit Union v. Estate of Turley*, No. E2019-00861-COA-R3-CV, 2020 WL 1652573, at *9 (Tenn. Ct. App. Apr. 3, 2020).

"Undue influence . . . consists of exerting enough influence or pressure to break down a person's will power and to overcome a person's free agency or free will so that the person is unable to keep from doing what he or she would not otherwise have done." *Rawlings v. John Hancock Mut. Life Ins. Co*., 78 S.W.3d 291, 301 (Tenn. Ct. App. 2001). David Coffey does not deny that a confidential relationship existed with Laura, but he correctly notes that this relationship alone does not warrant rescinding his purchase as unfair. It is not the relationship itself, but the abuse of it that concerns the courts. *In re Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001). Accordingly, proof of a confidential relationship must be supplemented "with evidence of one or more other suspicious circumstances that give rise to a presumption of undue influence." *Id*.

As to the purchase price David Coffey paid for SSN, the trial court found:

> The Court recognizes it must be cautious in allowing hindsight to influence this issue. The question is what information existed at the time of the valuation in 1996, and did David [Coffey] inappropriately influence the appraisal to his benefit and therefore to the detriment of the estate? The Court finds both Mr. Patton (who performed the Mercer valuation) and Mr. Kimb[all] (who critiqued the Mercer valuation) to be credible. However, this is not a case where the Court is responsible for determining the fair

market value of a business as it would in a divorce case. Here, the Court is reviewing the appraisal performed by Patton in 1996 to determine if it was improperly influenced.

The most significant fact concerning this issue was the failure of David [Coffey] and Attorney Hall to provide Patton with the Dear Laura letter which contained [the deceased's] rule of thumb that SSN should sell for 30% to 35% of the last twelve months gross revenue. Patton candidly admitted he would have considered that fact in his valuation, but he also doubted it would have impacted his ultimate value. There was no other evidence David [Coffey] improperly influenced the valuation. Although there were clearly differences of opinion in the methods used by Kimb[all] and Patton, the Court finds that those were differences of opinion and not fundamental errors which can be attributed to David [Coffey's] improper influence. To be sure, David [Coffey] breached his fiduciary duty to the estate by failing to provide the appraiser with [the deceased's] opinion.

Additionally, the trial court detailed the other factors that influenced the Mercer Valuation including that: SSN was a unique business concept; there were no comparable sales; the founder and key man was deceased; one of the other officers had left SSN; SSN's new president lacked experience in "two critical areas, compliance and sales reps"; Mr. Raffone had indicated that broker/dealer businesses like SSN were only selling for ten to fifteen percent of their gross revenues at the time; there was a single client who was responsible for twenty percent of SSN's revenue; and most economists did not expect the economy's growth from 1996 to 2000. For all of these reasons, the trial court could not conclude that David Coffey's failure to provide the appraiser with the deceased's rule of thumb for valuation had a material adverse impact on the Mercer Valuation.

On this issue, the trial court's order fairly outlines the testimony, other evidence, and the required information concerning how the trial court reached its ultimate conclusion based upon the facts presented. Discerning no error, we affirm.

Neither party requested attorney fees on appeal.

## V.    CONCLUSION

We affirm the decision of the Chancery Court. The case is remanded for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are taxed to the appellant, David L. Coffey.

_____

JOHN W. McCLARTY, JUDGE